**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0797n.06

No. 09-2631

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Dec 30, 2010**

LEONARD GREEN, Clerk

MICHAEL SANDERS,

    Plaintiff-Appellant,

        v.

KETTERING UNIVERSITY,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE: KENNEDY, COLE, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. Plaintiff Michael Sanders alleges that the decision of his employer, Kettering University, to terminate him constituted retaliation in violation of Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws Ann. § 37.2701. Sanders also alleges that his termination constituted a breach of contract. The district court granted Kettering's motion for summary judgment on all of Sanders' claims. Because there is no genuine issue of material fact as to whether Kettering had an honest belief in misconduct by Sanders, Sanders cannot establish that Kettering's stated reasons for terminating him were pretext for unlawful retaliation. However, Sanders presented a genuine issue of material fact on whether Kettering breached its contractual obligation not to fire him except for "just cause." Partial reversal of the district court's judgment is therefore required.

1

Sanders was employed as an assistant professor of industrial engineering at Kettering from November 2000 to July 2006, when he was terminated. Sanders was born in Iran and immigrated to the United States in 1984. Prior to his employment at Kettering, Sanders worked at Texas Tech University as an associate director of technology transfer and as a senior engineering/manufacturing specialist. During Sanders' employment at Kettering, he applied for tenure twice, in 2004 and 2005, and was rejected twice. The stated reasons for both rejections were the same: numerous deficiencies in Sanders' scholarship—including publishing few papers and conducting no research in his area of expertise—and teaching abilities—including repeated absences, poor student evaluations, and failing to establish expertise or strength in any particular subject. Though Sanders challenged his 2005 tenure denial, it was upheld at all levels of Kettering's tenure review process.

Sanders claims that during this same year, his faculty mentor, Ken Morrison, made derogatory comments about Sanders' nationality and/or Sanders' affinity for foreign business methodologies. Morrison allegedly called Sanders a "Japs Lover" (which Sanders claims was in reference to his experience with Japanese engineering models) in March 2005 and stated in August 2005 that "foreigners of Sanders' type could never understand the General Motors way of doing business." Sanders also claims that in early 2005, Morrison asked Sanders to consider severing Kettering's relationship with Cordys Corporation and instead work with Morrison and Cordys privately, which Sanders refused. Sanders says he complained to his department head, David Poock, about Morrison's behavior in August 2005 and complained to Morrison directly in October 2005. Soon afterwards, Sanders received an email from Morrison stating, among other things: "Your view on the situation is really unworthy of response"; "You did not respect the system and you paid the price"; "This process is impressive for its fairness"; and "My research only affected my vote. In

2

years, you did the rest of the damage yourself." Sanders believes Morrison sent the email in response to Sanders' complaints.

Several days after Morrison sent this email, several faculty members, including Morrison, submitted a faculty misconduct complaint against Sanders.[1] The complaint accused Sanders of numerous acts of misconduct, including: submitting inconsistent employment histories; misrepresenting himself as the prime author on a paper; representing that his relationship with Cordys was on-going when it had actually ceased due to Sanders' inappropriate behavior; and falsely claiming that approximately twenty percent of a $1 million software grant from Cordys to Kettering was "in cash" when in fact the grant included no cash component. In November 2005, these faculty members submitted a revised version of the complaint, further alleging (in relevant part) that Sanders falsely claimed to be a keynote speaker for a conference, falsely claimed $334,500 in secured grant money that Kettering never realized, and fraudulently received $25,000 from Cordys to organize a conference representing Kettering. Sanders met with Poock on November 2, 2005 and denied the allegations. Sanders submitted a written response denying the further allegations in the revised complaint on December 14, 2005.

Poock initiated Kettering's informal resolution process and mailed Sanders a copy of the complaint. Sanders demanded copies of the documentation supporting the complaints' allegations, and Poock informed Sanders how to access it. After this informal process failed, allegedly due to Sanders' refusal to participate in meetings with Poock, Poock instituted Kettering's formal procedures and suspended Sanders with pay pending the complaint's investigation. The stated

---

[1] While the complaint was submitted in October 2005, some of the signatories dated it December 2005. It is not clear whether this was done intentionally or accidentally.

3

purpose of the suspension was to separate physically Sanders from the complainants, in order to maintain the orderly functioning of the engineering department.

After Sanders in turn filed several complaints against Poock, Kettering removed Poock from the review process of the faculty complaint against Sanders. Kettering instead set up an independent committee, composed of Kettering employees from other departments, to investigate the faculty complaint. The committee members had no prior connection to Sanders and had no knowledge of his alleged complaints. The committee investigated the allegations in the faculty complaint over the course of seven months, although Kettering's formal procedures only allowed for a twenty-day investigation period. On March 23, 2006, committee head Mark Wicks asked Sanders to meet with the committee and answer questions regarding several matters. The committee also asked Sanders to bring documentation of his past employment to this meeting. This meeting took place on April 20, 2006. Kettering describes Sanders' behavior at this meeting as uncooperative and obstructive—arriving late and announcing that he would need to leave early, repeatedly raising the same objection to the few questions the committee managed to ask in the limited time available, demanding copies of all documentation, and badgering the committee with questions implying misconduct on the part of the committee members.

The committee issued its final report ("the Wicks Report") on June 19, 2006. Although the committee dismissed the majority of the allegations brought against Sanders, it found that Sanders took several improper actions during his employment at Kettering. First, the committee found that Sanders deliberately misrepresented that the $1 million Cordys software grant contained a twenty-percent cash portion. The committee determined that the grant actually consisted of "university wide use of Cordys CBP for $2,500 per seat for 400 seats," and that there was no evidence of a cash

4

contribution. Second, after delving further into the $334,500 secured-grant-money allegation, the committee found that Sanders deliberately misrepresented the value of this grant as being in excess of $500,000. Third, the committee found that Sanders misrepresented himself on his resume as the primary author of an article when he was actually the secondary author. Fourth, the committee found Sanders' claim to be the keynote speaker at a 2001 conference to be a misrepresentation. Fifth, the committee found that Sanders inappropriately withheld a portion of a $25,000 grant Cordys provided him to organize a conference that ended up being cancelled due to low attendance. Furthermore, the committee also found that Sanders misrepresented numerous employment dates on his employment application and/or 2005 tenure application and misrepresented his most recent salary prior to his employment at Kettering. Finally, the committee found that Sanders obstructed the committee's investigation by altering the contents of an email message that was part of the investigation record, and that he had shown contempt for the committee and disregard for the effective use of Kettering's resources by delaying meeting with the committee and then engaging in the aforementioned disruptive conduct at the meeting.

In response to these findings, Sanders claimed that the $1 million Cordys grant included technical/maintenance support as the supposed "cash" contribution, that the $334,500 grant amount would increase by $5,000 per additional license (accounting for the claimed $500,000 value), that any indication of himself as the primary author when he was in fact the secondary author was only a typo, that he in fact acted as a replacement keynote speaker, and that he did not claim to represent Kettering at the cancelled conference and that he and Cordys had settled the associated $25,000 grant issue. After reviewing the committee's findings, Kettering Provost Robert Simpson terminated Sanders' employment effective July 28, 2006.

5

Sanders brought suit against Kettering on May 15, 2007. He claimed that Kettering's denial of Sanders' tenure and termination constituted national-origin discrimination and unlawful retaliation, in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-2 to e-3, and Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws Ann. § 37.2701. Sanders also claimed that his termination constituted a breach of his employment contract with Kettering. Kettering moved for summary judgment on all Sanders' claims.[2] The magistrate judge recommended granting Kettering's motion in full, and the district court agreed. The district court held that Sanders had presented no direct evidence of national-origin discrimination or unlawful retaliation. Although the court held that Sanders had established a prima facie case of national-origin discrimination on the basis of circumstantial evidence, and reached no decision about a prima facie case of retaliation on circumstantial evidence, it held that Sanders could not prove that Kettering's stated reasons for terminating him were pretext for discrimination or retaliation. Next, the district court held that the "same actor inference" supported granting Kettering's motion. Finally, the court held that Sanders had not made out a prima facie case for his breach of contract claim.

Sanders then filed a motion for reconsideration with respect to the breach of contract disposition, arguing that this claim raised fact questions that only the jury could resolve. The district court denied this motion, holding that Kettering had reserved sole discretion to determine just cause for terminating Sanders. Sanders appealed the district court's grant of summary judgment to Kettering, but only with respect to his retaliation and breach of contract claims.

_____

[2] Following Kettering's filing of its motion for summary judgment, Sanders agreed to dismiss his denial-of-tenure claims.

## I.     Retaliation claim

Sanders cannot show a genuine issue of material fact that Kettering's stated reasons for terminating him were pretext for unlawful retaliation, since Kettering clearly had an honest belief in its proffered reasons for his termination. Hence, Sanders' retaliation claim fails. Sanders brought his claim pursuant to Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws Ann. § 37.2701. Though Sanders litigated this claim on both direct and indirect (circumstantial) evidence theories, he only challenges the district court's dismissal of the claim on a circumstantial evidence theory. To survive summary judgment, such claims must satisfy the burden-shifting framework familiar to federal retaliation claims. *See Garg v. Macomb Cnty. Cmty. Mental Health Servs.*, 696 N.W.2d 646, 653, (Mich. 2005); *Edwards v. Credit Acceptance Corp.*, No. 243140, 2004 WL 1103773, at *3 (Mich. Ct. App. May 18, 2004). The first two steps of this framework—Sanders' prima facie case and Kettering's proffered non-retaliatory reasons for terminating Sanders—are not disputed on appeal. Sanders challenges the district court's conclusion that his retaliation claim fails because he cannot make out a genuine issue of material fact that Kettering's stated reasons for his termination were actually pretext for unlawful retaliation.

Sanders argues that Kettering's stated reasons for his termination—the findings of Sanders' wrongdoing contained in the Wicks Report—have "no basis in fact," and therefore must have been pretext for retaliation, because he offered evidence which supposedly refuted the findings and highlighted procedural irregularities in the committee's investigation. However, the proper inquiry for arguing that Kettering's stated reasons are pretextual in that they have "no basis in fact" is not whether the stated reasons are ultimately shown to be incorrect. "[T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether

7

discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 527 (Mich. 2001) (alteration in original). Rather, the proper inquiry is whether Kettering had an "honest belief" in its proffered rationale. *See Swartz v. Berrien Springs Pub. Sch. Dist.*, No. 286285, 2009 WL 4163539, at \*5 (Mich. Ct. App. Nov. 24, 2009); *Nizami v. Pfizer, Inc.*, 107 F. Supp. 2d 791, 803-04 (E.D. Mich. 2000). "An employer's honest belief in a proffered reason for a challenged employment decision will be upheld against a charge of pretext as long as the employer can identify particularized facts for its honest belief." *Swartz*, 2009 WL 4163539, at \*5.

All the evidence shows that Kettering made a reasonably informed and considered decision to terminate Sanders, and that it therefore had an honest belief in its proffered non-retaliatory reasons for the termination. Sanders offers what he considers a point-by-point refutation of the Wicks Report's conclusions about his alleged improprieties. However, while Sanders' arguments may help discount some of Kettering's allegations, they simply do not call into question whether Kettering had an honest belief in the truth of these allegations. First of all, Sanders argues that he never misrepresented the nature of the cash component of the $1 million Cordys grant, explaining that twenty percent of the grant was cash "in that Cordys would pay for training and support of the Cordys application." Kettering quite sensibly responds that it always took "cash" to mean "currency," and that Sanders' attempt to redefine "cash" as "training and support" does evidence a deliberate misrepresentation on his part. Next, Sanders says he did not misrepresent himself as a keynote speaker at a conference, since he had to step in for a keynote speaker who could not attend, as confirmed by an eyewitness. Kettering, however, cited conflicting evidence showing that the conference's keynote speaker in fact attended and that Sanders' speech could not be characterized

8

as a keynote speech. This appears to show a good-faith factual dispute between the parties, something which cannot undermine Kettering's honest belief in its conclusions. As for the allegation that Sanders received money from Cordys to organize a conference that never took place and then failed to return the money, Sanders responded to the Wicks Report by arguing that his involvement in this matter had nothing to do with Kettering. Kettering's reply is quite reasonable—fraud committed off-the-job is still fraud.[3] Sanders provides no explanation for the disruptive behavior identified by the Wicks Committee, including fraudulently modifying an email in the committee's record. In addition, Sanders only responded to the alleged employment-history misrepresentation on appeal and not to the investigatory committee. These arguments do not raise any genuine issues of material fact as to Kettering's honest belief in its stated reasons for terminating Sanders.

As for the remainder of the allegations against him, Sanders argues that he did not deliberately misrepresent the value of a $334,500 grant as being in excess of $500,000, because according to Sanders, the original $334,500 value later increased to the claimed $500,000 value due to additional licenses, training, and/or upgrades. Sanders also explains away his alleged misrepresentation of himself as the primary author of a publication as a typographical mistake. While these arguments do provide some explanation for the alleged misrepresentations, Kettering's decision not to credit them cannot alone impugn Kettering's honest belief in its reasoning,

---

[3] Sanders further explains that he and Cordys settled the matter of the conference money, but it appears that Sanders only argued this on appeal and not to the investigatory committee. Moreover, Sanders' evidence and the Wicks Report indicate that he made only a "partial payment" of this money to Cordys, rather than a full reimbursement. While Cordys may consider the matter closed, this does not foreclose Kettering from considering Sanders' apparent failure to return the entire conference money to be a dishonest or unethical act.

particularly in light of the other findings to which Sanders offers no credible explanation or simply no explanation at all.

Similarly, the supposed procedural irregularities Sanders cites also do not undermine the fact that Kettering held an honest belief in its stated reasons for terminating Sanders. Among these, Sanders argues that after Kettering opened its investigation into Sanders, Kettering introduced new allegations of misconduct to which Sanders was not given a chance to respond. Presumably, Sanders refers to the employment history and disruptive-behavior allegations. The employment-history allegation, however, is not exactly new, as it was mentioned in the original faculty complaint. Moreover, during its investigation the committee wrote Sanders asking him to bring information about his employment history to their April 20, 2006 meeting. Sanders was not without notice of this allegation. As for the disruptive-behavior allegations, these only arose during the course of the committee's investigation, making meaningful prior notice impractical, if not impossible.

Citing further procedural irregularities, Sanders also argues that his paid suspension was not justified by Kettering's procedural rules. As Kettering notes, though, Sanders' suspension had nothing to do with the committee's investigation of the faculty complaints and played no role in the termination decision. The court therefore need not address this matter on appeal. While the committee's seven-month investigation exceeded the twenty-day period called for in Kettering's operating procedures, the significant number of allegations that the committee needed to investigate, as well as the new ones disclosed during the investigation, make this delay more of an act of thoroughness rather than a "fishing expedition," as Sanders calls it. The Wicks Report noted that "[b]ecause of the large number of allegations (fifteen) in the complaint filed against Professor Sanders, this investigation was complex and therefore time-consuming," and Sanders was warned

10

at the very beginning of the investigation that the committee might not be able to complete its work before Kettering's 2006 Winter term. As a final attack on the procedural fairness of Kettering's investigation, Sanders argues that the committee failed to consider the evidence supporting his explanations. The Wicks Report refutes this claim. The report mentions Sanders' principal evidence in its analysis, including his conference-keynote-speech eyewitness, documentation on Sanders' partial repayment of the Cordys conference money, and documentation from the sales coordinator for the $334,500 grant. The fact that the committee apparently chose to reject Sanders' evidence as not credible or insufficient does not mean the committee ignored it altogether. Sanders met with the committee on April 20, 2006, was informed of the matters the committee was exploring, and was invited to submit any documents he felt necessary to support his side of the story. Sanders also submitted written responses to the initial faculty complaint, the revised faculty complaint, and the Wicks Report. Although the committee obviously rejected these responses, this does not mean that the committee refused to accept or consider them altogether. Sanders' miniscule evidence of procedural irregularities in the committee's investigation does not discredit Kettering's honest belief in its proffered reasons for Sanders' termination and therefore does not raise a genuine issue of material fact on this matter.

Nothing else suggests any bias, prejudgment, or other impropriety in the committee's decision-making process so as to impeach Kettering's honest belief in its stated termination rationale. The individuals on the investigating committee had no prior connection with or knowledge of the allegations against Sanders; nor did the final decision-maker in the matter, Provost Simpson. Sanders presents no evidence that Morrison—whom Sanders identifies as the source of the discriminatory comments and the faculty complaints that directly led to Sanders'

11

termination—played any role in the investigation or termination decision (or that any of the other complaining faculty members did). Moreover, the Wicks Report noted that the committee decided, "[i]n fairness to Professor Sanders, . . . to disregard 'evidence' provided by the complainants that the team could not trace back to its original source." To this end, the committee actually dismissed most of the allegations charged in the faculty complaint (ten out of fifteen), strongly evidencing the fairness of the committee's investigation. In the end, the record supports, rather than detracts from, the conclusion that Kettering had an honest belief in its proffered reasons for terminating Sanders. Sanders thus has not established a genuine issue of material fact on whether Kettering's stated reasons had "no basis in fact," which is his only pretext argument offered on appeal. *See Campbell v. Dept. of Human Servs.*, 780 N.W.2d 586, 594 (Mich. Ct. App. 2009). His retaliation claim fails as a matter of law.

Sanders also charges several other errors on the district court's part regarding its dismissal of his retaliation claim. In our *de novo* determination that summary judgment was proper, we do not rely on the absence of direct evidence that Sanders complained of discrimination, or on the absence of any evidence that the committee findings were false or misleading, or on the "same actor inference." It is therefore not necessary for us to address these aspects of the district court's opinion.

## II.    Breach-of-contract claim

Sanders has raised a genuine issue of material fact about whether his termination was in violation of contractual provisions that he not be terminated without "just cause." For Sanders to survive summary judgment on his breach-of-contract claim, Michigan law required him to put forth a prima facie case by (1) proving the existence of the contract; (2) producing testimony that he had performed it up to the time of his discharge; and (3) providing proof of damages. *Rasch v. City of*

*E. Jordan*, 367 N.W.2d 856, 858 (Mich. Ct. App. 1985). The district court held that Sanders had not performed his contract up to the time of discharge, and thus that he had not made out a prima facie case. Because Sanders raised evidence supporting his contention that he in fact was performing his contract up to the time of discharge, however, the question of whether Kettering terminated him for "just cause" should have been submitted to the jury under *Toussaint v. Blue Cross & Blue Shield of Michigan*, 292 N.W.2d 880 (Mich. 1980).

There is no dispute that Sanders' employment contract allowed him to be terminated only for just cause. Kettering's Faculty Handbook states that "[n]o faculty member may be disciplined or dismissed during an appointment period without a finding of adequate cause." There is also no dispute that Kettering specified certain practices as constituting "adequate" or "just" cause for termination, among them, "dishonesty in professional activities." What Sanders does dispute is that his actions counted as "dishonesty in professional activities" or any other Kettering-defined category of "adequate" or "just" cause. As discussed in the context of his retaliation claim, Sanders submitted what he considers a point-by-point refutation of Kettering's stated reasons for his termination. Sanders denies that he took certain actions Kettering charges him with, and for the actions he did take he denies that he intended any fraud or misrepresentation by them.

While Sanders' evidence is not so compelling as to show a genuine issue of material fact on whether Kettering's stated termination reasons are pretextual in that they literally have "no basis in fact"—so compelling as to demonstrate that Kettering could not have had an honestly held belief in the stated reasons—the evidence is sufficient under Michigan law to raise factual questions on whether just cause existed for Sanders' termination. When a just-cause relationship is established between the parties, it is generally the job of the trier of fact to decide whether there was cause for

13

termination. "[W]here an employer has agreed to discharge an employee for cause only, its declaration that the employee was discharged for unsatisfactory work is subject to judicial review. The jury as trier of facts decides whether the employee was, in fact, discharged for unsatisfactory work." *Toussaint*, 292 N.W.2d at 895. Specifically, "[w]here the employer claims that the employee was discharged for . . . dishonesty . . . and the employee claims that he did not commit the misconduct alleged, the question is one of fact for the jury: did the employee do what the employer said he did?" *Id.* at 896. This is the very situation in Sanders' case. Although there is no genuine issue of material fact that Kettering held an honest belief that Sanders' actions constituted "just cause" under their employment contract, justifying his termination, a jury hearing Sanders' evidence may reach an honest belief opposite that of Kettering. Sanders made a prima facie case on his breach of contract claim and summary judgment was not appropriate.

Kettering argues that, notwithstanding whether Sanders made a prima facie case, Kettering reserved full discretion under the employment contract to determine whether Sanders' actions constituted just cause for termination. Thus, says Kettering, Sanders' termination is foreclosed altogether from judicial review. This exception to a claimant's right under Michigan law to have a jury review his breach of contract/wrongful discharge action is set forth in *Thomas v. John Deere Corp.*, 517 N.W.2d 265 (Mich. Ct. App. 1994).[4] In *Thomas*, the court explained that "the same evidence relied on to demonstrate that defendant had limited its ability to terminate plaintiff's

---

[4] The *Thomas* exception has been reaffirmed by various Michigan cases. *See, e.g.*, *Merlino v. MGM Grand Detroit, LLC*, No. 247165, 2004 WL 2050305, at *4 (Mich. Ct. App. Sep. 14, 2004); *Bengel v. W.A. Foote Mem'l Hosp.*, No. 209604, 1999 WL 33438074, at *2 (Mich. Ct. App. Aug. 3, 1999); *Stack v. K-Mart Corp.*, No. 175096, 1996 WL 33348776, at *2 (Mich. Ct. App. Nov. 8, 1996).

employment also establishes that defendant reserved for itself sole authority to decide whether termination was justified." *Id.* at 267. Hence,

> [b]ecause the defendant had reserved for itself the authority to determine whether there was good and just cause, and because defendant had, in the manner provided by the alleged employment contract, determined that there was good and just cause for terminating plaintiff's employment, terminating plaintiff's employment was not a breach of that contract.

*Id.*[5]

Kettering's argument has no merit, however, since there is no evidence that the *Thomas* exception applies to the instant case. The language of the employment contract in this case, unlike that in *Thomas*, never states that Kettering reserves sole authority to determine whether its employees' conduct constitutes just cause for termination. Although the contract identifies particular standards for dismissal, defines several categories of conduct that may constitute "adequate" or "just" cause for dismissal, and sets forth disciplinary procedures Kettering and its employees must follow, none of this appears to mean that Kettering reserved sole authority unto itself to determine whether dismissal was justified and for just cause.

*Merlino v. MGM Grand Detroit, LLC*, No. 247165, 2004 WL 2050305 (Mich. Ct. App. Sep. 14, 2004), provides a helpful comparison. In *Merlino*, the plaintiff alleged that he was wrongfully terminated from his position as a pit manager at defendant's casino after several of his female co-workers complained that he had sexually harassed them. *Id.* at *1. The court upheld the jury's determination that the contract was one for just cause, and rejected the defendant's argument that

---

[5] "In rendering its decision, the *Thomas* court did not quote the exact language of the contract that provided the basis for its finding that the defendant had 'reserved for itself the authority to determine whether there was good and just cause.'" *Bengel v. W.A. Foote Mem'l Hosp.*, No. 209609, 1999 WL 33438074, at *2 (Mich. Ct. App. Aug. 3, 1999) (quoting *Thomas*, 517 N.W.2d at 267).

it had reserved sole authority to itself to determine just cause per *Thomas*.  *Id.* at \*3-5.  The defendant based its *Thomas* argument on several contractual provisions, but the court held that these were not enough to reserve sole authority to determine the just cause of a termination.

> Specifically, defendant asserts that its policy manual defines just cause as "a valid business reason, including but not limited to situations where [an employee] . . . violates a policy or rule of conduct, or disrupts company operations," and that plaintiff's actions clearly violate defendant's sexual harassment policy.  However, the excerpts provided from defendant's employee handbook and policy manual do not contain any provision reserving unto defendant the sole authority to decide whether an employee actually committed the misconduct alleged, that the alleged misconduct equated to sexual harassment as defined in defendant's policy manual, or that termination of the employee is justified.
>
> Indeed, the only reference in those materials to defendant's ability to determine whether termination is justified states that employees may be immediately terminated for just cause for engaging in "Conduct which MGM Grand Detroit determines violates its policies against sexual harassment and/or other harassment in such a manner to warrant immediate discharge."  While this clause states that defendant may determine that an employee has engaged in conduct that violates its sexual harassment policy, thus providing just cause as defined in its policy manual for immediate termination, it does not state that defendant has reserved onto itself the sole authority to do so.  Moreover, it does not state that defendant has reserved onto itself the sole authority to determine whether the employee did, in fact, engage in the alleged misconduct.  Therefore, we conclude that defendant's assertion that plaintiff is not entitled to have a jury review whether his termination was for just cause is without merit.

*Id.* at \*4 (alterations in original).

Kettering's contract language is very similar to that in *Merlino*.  It provides that "[n]o faculty member may be disciplined or dismissed during an appointment period without a finding of adequate cause.  Violations of the Standards of Professional Conduct (Section 7.2) or engaging in Unacceptable Conduct (Section 7.3) constitute reasons, which are intended to be illustrative and not all-inclusive, for discipline or discharge."  Both the Kettering and *Merlino* contracts set forth a non-exhaustive list of general categories of misconduct that of themselves constitute "adequate" or "just"

16

cause meriting dismissal. However, neither contract actually employs language purporting to reserve sole discretion to the employer to determine the just cause of an employee's termination. As the *Thomas* exception did not apply in *Merlino*, it logically should not apply here. Kettering argues that the magnitude of its fact-finding procedure for employee termination distinguishes this case from *Merlino*, but this is not accurate: the lack of unequivocal "sole discretion language" was the critical reason in *Merlino* for why the *Thomas* exception did not apply, not the adequacy of the employer's fact-finding procedures. Kettering has not reserved sole authority to define just cause and to determine whether Sanders' termination was justified.[6]

The parties agree that Sanders' breach-of-contract claim is brought pursuant to supplemental jurisdiction. However, neither the federal Title VII claim nor the similar Elliott-Larson claim remains in this case. On remand, the district court may consider exercising its discretion to dismiss

---

[6]Even if Kettering's Faculty Handbook reserved to Kettering the sole authority to determine whether it had just cause to terminate an employee, this fact would not insulate Sanders' dismissal from judicial review. In order to qualify for the exception articulated in *Thomas*, an employer's "determination that just cause existed [must be] made by the designated personnel . . . in the manner provided by the alleged employment contract." *Thomas*, 517 N.W.2d at 267. Kettering did not follow the procedures outlined in its Faculty Handbook before terminating Sanders, so the decision to dismiss Sanders was not made in accordance with the terms of his employment contract. Under the formal procedures for investigating a complaint against a faculty member, "a summary of the investigative findings of the complaint" should issue with the academic Department Head's recommendation of "what actions shall be taken to resolve the complaint" and the "justifications for the Department Head's decision." The affected faculty member then has an opportunity to appeal the proposed resolution of the complaint to an Appeal Board convened by the Provost, and then to the President. Here, the Wicks Report did not contain any recommendation from Mark Wicks—the acting Department Head in Sanders' investigation—as to the resolution of the complaint against Sanders, let alone a recommendation that Sanders should be terminated. Instead, Provost Simpson made a unilateral decision to dismiss Sanders, without allowing Sanders the opportunity to challenge his termination under the designated appeal procedures. Thus, even though, as discussed above, the procedural irregularities in Sanders' investigation did not undercut Kettering's honest belief that it had just cause to dismiss Sanders, Kettering's failure to extend all of the procedural protections it promised to Sanders before dismissing him subjects its just-cause determination to judicial review.

this breach-of-contract claim without prejudice so that Sanders can instead raise it in state court. "Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)). "Residual jurisdiction should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006).

Should the district court determine that the exercise of supplemental jurisdiction is not warranted, the court would also have to determine whether the requirements of diversity jurisdiction are met. When this question was raised at oral argument, neither counsel was able to state unequivocally that Sanders was not a Michigan domiciliary at the time suit was brought. Such a showing would appear to be necessary for diversity jurisdiction. *See, e.g.*, *Napletana v. Hillsdale Coll.*, 385 F.2d 871, 872 (6th Cir. 1967) (stating that "District Court had jurisdiction over this action if diversity of citizenship existed at the time the complaint was filed"); *accord Goldsmith v. Mayor & City Council of Baltimore*, 845 F.2d 61, 62 n.1 (4th Cir. 1988) (explaining that diversity jurisdiction was not acquired where plaintiff changed her domicile after complaint was filed). Absent either supplemental jurisdiction or diversity jurisdiction, the contract claim should be dismissed without prejudice for lack of jurisdiction.

The judgment of the district court granting Kettering's motion for summary judgment is affirmed with respect to Sanders' retaliation claim. The judgment is reversed with respect to Sanders' breach-of-contract claim, and the case is remanded for further proceedings consistent with this opinion.